## UNITED STATES et al. v. SHISSLER et al.
### No. 13803.

District Court, N. D. Illinois, E. D.
April 14, 1934.

Francis X. Busch and John S. Miller, Sp. Assts. to U. S. Atty., both of Chicago, Ill., for plaintiffs.

Joseph C. Kanak and K. B. Czarnecki, both of Chicago, Ill., for defendants.

HOLLY, District Judge.

Complainants have filed their bill of complaint in which they seek an injunction restraining defendants from distributing, selling, marketing, or handling milk or cream

for consumption in the Chicago Sales Area and have moved the court to issue a preliminary injunction so restraining the defendants.

In their bill of complaint plaintiffs allege that in accordance with the United States statute known as the Agricultural Adjustment Act (7 USCA §§ 601–619), and the General Regulations, Agricultural Adjustment Administration, Series 4, Revision 1, promulgated by the Secretary of Agriculture pursuant to the authority vested in him by the act and approved by the President of the United States on February 3, 1934, the Secretary issued a "License for Milk—Chicago Sales Area," which became effective February 5, 1934, and remained in effect continuously thereafter up to the present time, except that it had been revoked as to defendants; that in and by said license the Secretary licensed each and every distributor of fluid milk distributing such milk in the Chicago Sales Area (defined and described in the license as the city of Chicago and all that territory within thirty-five miles of the corporate limits of the city of Chicago) subject to the terms and conditions set forth in the license; that pursuant to the provisions of the license, the Secretary of Agriculture on February 3, 1934, designated one Frank C. Baker as Market Administrator under the terms of said license, and that said Baker has been ever since, and is now, acting as such Administrator and performing the duties of the office; that defendant Shissler was on the date of said license, and has been continuously since, engaged in the business of purchasing milk in fluid form from producers thereof residing in the states of Wisconsin and Illinois and selling the same to divers persons, who in turn distribute such milk for consumption in the Chicago Sales Area; that defendant People's Dairy Company was on the date of said license, and has been continuously since, engaged in the business of purchasing milk from defendant Shissler, and selling and distributing the same to consumers in the Chicago Sales Area; that said defendants are, and each of them is, a distributor of milk as defined in such license, and were licensed, in and by said license, to engage in the distribution of fluid milk as distributors in the Chicago Sales Area; that on August 25, 1933, the Secretary of Agriculture promulgated General Regulations, Agricultural Adjustment Administration, Series 3, relating to the revocation and suspensions of licenses and the procedure therefor, which were duly approved by the President on August 26, 1933, said Regulations providing the procedure for the revocation of licenses pursuant to section 8 (3) of the said act (7 USCA § 608 (3); that on February 20, 1934, Rexford G. Tugwell, Assistant Secretary of Agriculture, believing defendants had violated the terms and conditions of the license, caused notice to be served on said defendants to show cause on or before March 3, 1934, why their licenses should not be revoked or suspended; that defendants filed their answers, and thereafter a public hearing was had at which defendants appeared and presented evidence, and thereafter, upon consideration of the matters presented and pursuant to the provisions of said act and the General Regulations adopted by the Secretary of Agriculture thereunder, the Secretary found that defendants had violated the terms and conditions of the licenses and the license of each of said defendants was revoked, that of Shissler on March 26, 1934, and that of People's Dairy Company on March 29, 1934, a copy of each of the orders being attached to the bill of complaint as an exhibit; that a copy of the order revoking the license of Shissler was transmitted to him by registered mail on March 26, 1934, and received by him on March 28, 1934, and a copy of the order revoking the license of the People's Dairy Company was transmitted to it by registered mail on March 29, 1934, and received by it on March 30, 1934.

It is further charged in the bill of complaint that each of the defendants violated the terms of the license in the respects found and set forth in the orders of revocation, and that neither defendant from the date of the issuance of the notices to show cause had complied with the terms of the license, but that each has continuously since the date of such notice, to and including the dates on which the respective licenses were revoked, continued to do business in violation of the terms and conditions of the license.

It is further charged that, in addition to the violations of said license set forth in the order revoking his license, defendant Shissler had violated the terms of said license by neglecting and refusing to pay to the producers from whom he purchased milk the purchase price therefor required to be paid by the terms of said license, but had paid to said producers a less price and failed to make reports and to pay the Market Administrator the moneys required to be paid to said Administrator by the terms of said license on his adjustment account with respect to milk purchased by him during the period from February 5, 1934, pursuant to the provisions of the license, and that because of such failure the Market Administrator was

unable to determine the amount due and owing from Shissler on his adjustment account pursuant to the terms of the license and in other respects; that defendant People's Dairy Company purchased from defendant Shissler all the milk sold, handled, or distributed by it, and that he is president and director of and has under his control all the outstanding stock of the company; that the board of directors consists of three persons including said Shissler, the other two being employees of Shissler; that said Shissler has an exclusive contract with the People's Dairy Company to sell to said defendant its total supply of milk for the term of five years, and under the terms of the contract the People's Dairy Company is required to pay to Shissler for milk delivered to it only the cost of the milk to Shissler plus a hauling charge, and that each of said defendants has continuously since the date of the revocation of its license, to and including the date of the filing of the bill, engaged in the business of purchasing milk in fluid form from producers for consumption in the Chicago Sales Area; that notwithstanding the revocation of their respective licenses, said defendants are continuing to engage in the business of purchasing milk in liquid form and distributing the same in the Chicago Sales Area.

The Regulations mentioned in the bill of complaint made by the Secretary of Agriculture provide that whenever the Secretary has issued or shall issue a license, then while said license is in effect, no person shall in the territory covered by and in said license engage in the handling of any commodity or commodities described in said license unless such person has been licensed in and by said license to engage in such handling of such commodity or commodities. By the terms of the license, a copy of which is attached to the bill of complaint, a distributor was defined to be a person engaged in the business of distributing, marketing, or in any manner handling milk in fluid form for consumption in the Chicago Sales Area, and such distributor was required by the terms of the license to pay to the producer a certain fixed price for milk of the various kinds described in the license.

By the terms of the license the Secretary of Agriculture finds that the marketing of milk for distribution as fluid milk in the Chicago Sales Area and the distribution thereof are entirely in the current of interstate commerce, because said marketing is partly interstate and partly intrastate commerce and so inextricably intermingled that the interstate portion cannot be effectively regulated or licensed without regulating that portion which is intrastate commerce. The license fixes the price which shall be paid by the distributor to the producer. As the returns for fluid milk when sold to the consumer vary, depending on whether it is sold to be consumed as fluid milk, as cream, or in the form of butter, cheese, or other manufactured milk products, and as the aim of the Secretary is to secure the same price to each producer, no matter what the ultimate use of his milk may be, whether sold to the consumer as whole milk or used for the production of cream, butter, cheese, or other milk product, each distributor is required by the terms of the license to report to the Market Administrator, among other things, the names of the producers from whom he has purchased milk, the quantities purchased from each, the quantities sold by him, and the uses thereof, whether as whole milk or for the production of cream, or for other purposes. By the terms of the license the milk produced is divided into three classes, according to its ultimate use. Class I is such milk as is sold by the distributers as whole milk for consumption in the Chicago Sales Area. Class II is that which is used by the distributors to produce cream for sale by the distributors as cream for consumption in the Chicago Sales Area. Class III comprises the milk purchased by the distributors in excess of Class I and Class II and is used for the production of butter, cheese, and other manufactured milk products.

The license fixes a price for each class of milk. For Class I the price is $1.75 per hundredweight; for Class II, a price of $1.25 per hundredweight; and for Class III, three and one-half times the average price of ninety-two score butter at wholesale in the Chicago market as reported daily by the United States Department of Agriculture for the calendar month during which the milk is purchased plus 4 cents. From the reports the Market Administrator computes the blended or average price of the milk sold by the various producers to the distributors (certain other matters being taken into consideration which need not be mentioned here) and reports the same to the distributors, who then are required to pay such average price to each producer no matter what the use to which the particular producer's milk was put. As a result of this process, each producer gets the same price for the milk sold by him as every other producer, but a distributor whose milk has been used for the production of butter, cheese, etc., has paid more for his milk than he should, while one whose milk has

been used as whole milk has paid less. To equalize these differences, the Market Administrator sets up an adjustment account for each distributor. Those who have paid too little are required to pay the balance to the Market Administrator and he, from the funds so furnished, reimburses those who have paid too much.

Defendants have appeared and filed a motion to strike out certain paragraphs of the bill of complaint, a motion to dismiss the bill, an answer to certain portions of the bill, and a counterclaim in which they pray that the court may adjudge the Agricultural Adjustment Act to be unconstitutional and void and that the complainants in the original bill and defendants in the cross-bill be enjoined and restrained from prosecuting any proceedings at law or in equity and from carrying on any criminal proceedings against the cross-complainants.

The answer goes only to paragraphs 1 to 12 (except paragraph 8) of the bill, and defendants move to strike paragraphs 8 and 13 to 36. As to paragraphs 2, 3, 4, 5, 6, and 12, defendants pray to be excused from answering for the present. They admit the allegations in paragraphs 1, 10, and 11, and neither admit nor deny the allegations of paragraph 9, a paragraph in the bill which merely states that the evidence taken at the hearing in the proceedings to revoke the licenses of defendants was taken in writing and was reported by the presiding officer together with proposed findings of fact and recommendations to the Secretary of Agriculture. On the argument it was admitted by defendants that the statements of facts contained in the bill were true. The bill was verified by the affidavit of Rexford G. Tugwell, the Assistant Secretary of Agriculture. In view of this statement of counsel at the trial and the condition of the pleadings, the allegations of the bill on this motion for a temporary injunction may be taken as true.

■ It is insisted by defendants that the Agricultural Adjustment Act is invalid. The defendants say that it is beyond the power of Congress, in the exercise of the authority granted to it to regulate Interstate Commerce, to fix the price at which a commodity may be bought or sold. But the power granted to Congress to regulate Interstate Commerce by clause 3 of section 8 of article 1 of the Constitution has no limitations other than those that may be found in the Constitution itself. Except as prohibited by some other provisions in the Constitution, Congress has complete and unlimited power. Gibbons v. Ogden, 9 Wheat. 197, 6 L. Ed. 23; McDermott v. Wisconsin, 228 U. S. 115, 33 S. Ct. 431,

57 L. Ed. 754, 47 L. R. A. (N. S.) 984, Ann. Cas. 1915A, 39.

■■ The only other provision in the Constitution which in any way limits this power of Congress is the Fifth Amendment, which contains the provision that no person shall be deprived of life, liberty, or property without due process of law.

Does this limitation prevent Congress in the exercise of the power to regulate Interstate Commerce from fixing prices in a period of emergency? This court is not required to search for an answer to this question. The answer has been given by the Supreme Court of the United States in Nebbia v. People of the State of New York, 54 S. Ct. 505, 78 L. Ed. ——, 89 A. L. R. 1469, decided March 5, 1934. The court there held that the statute of the state of New York creating a Milk Control Board with power to fix maximum and minimum prices to be charged by the store to consumers, and the action of the Board in fixing the price of 9 cents per quart did not contravene the due process clause of the Fourteenth Amendment. That an emergency does now exist requiring the fixing of the price of milk to the producer is found and declared by Congress in the act passed May 12, 1933 (48 Stat. 31, USCA, tit. 7, ch. 26 [sections 601–609]), and the court may take judicial notice that the emergency exists.

It is urged by the defendants that the Secretary of Agriculture is attempting not only to regulate interstate commerce but intrastate as well. The Secretary has established regulations which prohibit the marketing of milk in the Chicago Sales Area without a license even though such milk is produced in Illinois, purchased in Illinois from the producer by the distributer, and sold by the distributer in Illinois to be consumed in Illinois.

The act (section 8 (3) gives to the Secretary of Agriculture authority to issue licenses "permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof. * * * Such licenses shall be subject to such terms and conditions, not in conflict with existing Acts of Congress or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy" of Congress as set forth in the second section of the act (7 USCA § 602), and to require licensees to furnish such reports as to quantities of agricultural commodities or products thereof bought or sold and the prices there-

of, and as to trade practices and charges, and keep such accounts as may be necessary to give effect to the act. Engaging in the handling of such commodities without a license is prohibited, and the Secretary is given power to revoke any such license issued by him, after due notice and opportunity for hearing, for violation of the terms or conditions thereof.

By virtue of the authority thus given a license was issued by the Secretary licensing all dealers in the Chicago Sales Area. It was recited in the license that the Secretary had found that "the marketing of milk for distribution as fluid milk in the Chicago Sales Area and the distribution of said fluid milk are entirely in the current of interstate commerce because said marketing and distribution is partly interstate and partly intrastate commerce and so inextricably intermingled that the said interstate portion cannot be effectively regulated or licensed without regulating or licensing that portion which is in interstate commerce."

It is charged in the bill of complaint, also, and not denied, that it is impossible to regulate the business of purchasing, selling, distributing, and handling milk shipped from states other than the state of Illinois into the Chicago Sales Area for consumption therein without regulating the business of purchasing, selling, handling, and distributing milk produced in the state of Illinois for consumption in the Chicago Sales Area; that not less than 40 per cent. of all the milk sold as whole milk within such area is produced outside the state of Illinois; that the cream sold in the Chicago Sales Area in 1933 came from milk produced in fourteen different states, and that only 28.8 per cent. of such milk was produced in the state of Illinois, and that an attempt to require an increased price to be paid to milk producers who are nonresidents of Illinois for milk sold for consumption in the Chicago Sales Area without requiring an equal increase in the price paid to Illinois producers for similar milk would result in complete demoralization of the market; that to maintain their position in the Chicago market, producers outside the state of Illinois would be forced to engage in a price war with Illinois producers. These conclusions of the pleader are evident truths. It would be impossible for the Secretary of Agriculture to maintain a standard of prices for nonresident producers whose milk was consumed in the Chicago Sales Area if the price to producers in Illinois was left unregulated. There is no escaping the finding of the Secretary set forth in the license that the intrastate and interstate transactions are so inextricably intermingled that interstate commerce in fluid milk in the Chicago Sales Area cannot be effectively regulated without regulating that portion which is intrastate.

The power of Congress to regulate intrastate commerce when the situation becomes such by reason of the interblending of the interstate and intrastate operations that adequate regulation of the particular commerce between the states cannot be maintained without regulating intrastate transactions of like character seems to be well settled. Minnesota Rate Cases, 230 U. S. 352, 431, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Houston, E. & W. Texas Ry. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Georgia Public Service Commission v. United States, 283 U. S. 765, 51 S. Ct. 619, 75 L. Ed. 1397; State of Alabama v. United States, 283 U. S. 776, 51 S. Ct. 623, 75 L. Ed. 1406; United States v. Louisiana, 290 U. S. 70, 54 S. Ct. 28, 78 L. Ed. 181.

In the first two cases above cited, the issue presented was whether the intrastate rates of an interstate carrier could be regulated when by reason of the interblending of its interstate and intrastate operations adequate regulation of its interstate rates could not be maintained without regulating its intrastate business. But in Georgia Public Service Commission v. United States, 283 U. S. 765, 51 S. Ct. 619, 75 L. Ed. 1397, supra, the court sustained a general order concerning intrastate rates which was applicable to all carriers whether operating interstate or solely intrastate lines. Following the Minnesota Rate Cases, Congress in 1920, by paragraphs 3 and 4 of section 13 of the Interstate Commerce Act (49 USCA § 13, pars. 3, 4), authorized the Interstate Commerce Commission to fix rates and fares for intrastate transportation whenever it should find that the rate fixed by a state or state commission gave an undue preference and advantage to intrastate over interstate traffic. And the power of Congress to regulate intrastate rates under such circumstances has not been questioned.

I am of the opinion that the Secretary has not exceeded his lawful powers in fixing the prices to be paid to producers for milk sold to distributers for distribution in the Chicago Sales Area.

It is contended by the defendants that Congress could not properly delegate authority to the Secretary of Agriculture to provide regulations concerning the purchase and

128

sale of milk and to fix the price to be paid to the producer. But the power of Congress to delegate such administrative duties is too well settled to be now debatable.

■ A further contention of defendants is that the burdens imposed upon the distributer by the terms of the license in the way of keeping books and records, furnishing reports, and giving bond, are invalid. But on this question also the authorities are against the defendants. Charlotte, etc., R. R. Co. v. Gibbes, 142 U. S. 386, 12 S. Ct. 255, 35 L. Ed. 1051; People ex rel. N. Y., etc., Co. v. Squire, 107 N. Y. 593, 14 N. E. 820, 1 Am. St. Rep. 893; Id., 145 U. S. 175, 12 S. Ct. 880, 36 L. Ed. 666; Chicago, etc., Coal Co. v. People, 181 Ill. 270, 54 N. E. 961, 48 L. R. A. 554; State v. Wordin, 56 Conn. 216, 14 A. 801.

■ It is urged by defendants that this is not a proper case for the intervention of a court of equity, that no property rights are involved, and that the government is not entitled to the process of injunction, but the Supreme Court has held otherwise in U. S. v. American Bell Telephone Co., 128 U. S. 316, 9 S. Ct. 90, 32 L. Ed. 450, and Sanitary District of Chicago v. U. S., 266 U. S. 405, 45 S. Ct. 176, 69 L. Ed. 352. There have been like rulings in many other cases by the various United States Circuit Courts of Appeals and District Courts.

■ Other objections have been urged, such as there is no authority for the requirement of the license requiring the giving of a bond or the provisions requiring the withholding of moneys by the purchaser of milk to be turned over to the Market Administrator. I have carefully considered these objections and examined the authorities cited and am of the opinion that they are not valid.

It is the judgment of the court that a temporary injunction should issue as prayed by the complainants.