## UNITED STATES v. CANFIELD LUMBER CO.

### No. 1310.

District Court, D. Nebraska, Omaha Division.

Aug. 29, 1934.

Charles E. Sandall, U. S. Dist. Atty., of Omaha, Neb., and Robert W. Strange, for the United States.

William H. Thompson & Son and Eugene N. Blazer, all of Omaha, Neb., for defendant.

DONOHOE, District Judge.

This action is brought by the United States seeking an injunction against the defendant, Canfield Lumber Company, a corporation, enjoining and restraining it from selling at re- tail, lumber, building materials, and building specialities at less than actual cost, plus cost of handling and delivery, cost of selling and administration expenses, as computed under the provisions of the code of fair competition for retailing lumber, lumber products, and building specialities, approved by the President of the United States, and from continuing to violate the provisions of said code.

The defendant is a retail lumber dealer, conducting its business in Omaha, and the charge against the defendant in the bill of complaint is that it has sold and proposes to sell lumber, building materials, lumber products, and building specialities at retail in violation of the provisions of the code.

That the violations of the provisions of the code have been open, notorious, and continuous in transactions in or affecting interstate commerce. The bill alleges ten specific violations with reference to the grade and species of the material sold and delivered, and of substitutions of dimensions, grades, and specifications, other than those called for in the estimate, and it is further alleged that between February 18, 1934, and May 20, 1934, the defendant caused to be inserted and published in the Omaha World Herald and the Omaha Bee-News, in violation of the code, advertisements for the sale of lumber and lumber products, of a misleading and deceptive nature, in that the advertisements in numerous instances failed to specify the grades of the materials therein contained, and did not in many instances specify whether the prices therein contained were "cash and carry at the yard" or "for delivery on the job," and in which advertisements prices were quoted below the minimum cost prices as established under authority of the code for standard materials, without stating whether the materials were standard or substandard, all of which is alleged as an unfair method of competition with the other members of the industry in places where the newspapers circulate; that the newspapers circulate not only in the state of Nebraska, but likewise in the state of Iowa and other states, and that the advertisements had a direct and burdensome effect, and still have such direct and burdensome effect on the sale of lumber and building materials in states outside of the state of Nebraska; that all of the transactions alleged have affected, and do affect, and if persisted in will affect, interstate commerce, and constitute an obstruction and will work a frustration of the purposes and the policy of the National Industrial Recovery Act, and that the public interest will be en-

696

dangered and jeopardized, and an irreparable injury will be caused to many persons.

The answer of the defendant is in substance that the National Industrial Recovery Act (48 Stat. 195) is unconstitutional and void for the following reasons:

1. It is an unlawful and invalid delegation of legislative authority by Congress to the President.

2. The fixing of prices and the prohibition of the sale of lumber below such determined cost is a subterfuge and an arbitrary exercise of power in the guise of a regulation under the commerce clause of the Constitution, and tends to deprive the defendant of its property without due process of law.

3. That the act and the code approved under authority thereof, restricting and regulating the retail of lumber, and prescribing the details of bids and estimates of costs, is an undue invasion of the defendant's personal rights, immunities, and liberties.

4. That defendant's business is neither a part of the interstate commerce, nor does it directly affect interstate commerce, and consequently the provisions of the act and the retail lumber code approved thereunder has no application to it, and any attempted application or enforcement thereof as against the defendant, constitutes an unlawful invasion by Congress of the powers reserved to the state, and an undue extension of the implied powers of Congress.

That the defendant has and proposes to ignore the provisions of the code is not seriously disputed, nor is it denied that defendant has violated certain of its provisions. The questions to be determined then may be stated:

Is the law constitutional?

Does the manner in which the defendant has and is operating its business constitute interstate business, or does it burden, obstruct, or diminish the free flow of interstate commerce?

That the law is constitutional we think cannot be seriously questioned. We think it is not an unconstitutional delegation of legislative authority to the President. We have found no case, and none has been cited to us, where the Supreme Court of the United States has declared an act of Congress unconstitutional because it contained a delegation of legislative authority, while, on the other hand, there are many decisions upholding the statutes where Congress has delegated authority to carry out and administer general legislation. Field v. Clark, 143 U. S.

649, 12 S. Ct. 495, 505, 36 L. Ed. 294; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 355, 48 L. Ed. 525; Union Bridge Company v. United States, 204 U. S. 364, 27 S. Ct. 367, 374, 51 L. Ed. 523; United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; Pennsylvania Ry. Co. v. International Coal Mining Company, 230 U. S. 184, 33 S. Ct. 893, 57 L. Ed. 1446; Hampton, Jr. & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624; Wisconsin v. Illinois, 278 U. S. 414, 49 S. Ct. 163, 73 L. Ed. 426.

In the enactment of the law, Congress declared "a national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people." Section 1 (15 USCA § 701). The Congress further declared its policy: "to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production, * * * to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." Section 1 (15 USCA § 701). By section 702, subd. (a), the President is authorized to establish agencies and to prescribe their responsibilities to effectuate the policy. By subdivision (b) the President is given power to delegate any of his functions and powers under the act to his officers, agents, and employees, to aid in carrying out the functions of the law. In none of the decisions above quoted has the Supreme Court anywhere intimated that such a delegation of authority and power is unconstitutional.

In the case of Buttfield v. Stranahan, Chief Justice White said: "We may say of the legislation in this case, as was said of the legislation considered in Field v. Clark, that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the ne-

cessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted."

And in the case of Union Bridge Company v. United States, supra, the court, in considering the proposition here involved, stated: "If the principle for which the defendant contends received our approval the conclusion could not be avoided that executive officers, in all the departments, in carrying out the will of Congress, as expressed in statutes enacted by it, have, from the foundation of the national government, exercised, and are now exercising, powers as to mere details, that are strictly legislative or judicial in their nature. This will be apparent upon an examination of the various statutes that confer authority upon executive departments in respect of the enforcement of the laws of the United States. Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business."

But it is contended that Congress failed to supply the necessary legislation, but undertook to transfer that power to the President. We think otherwise. We think the matter delegated to the President was administrative detail. In the case of Field v. Clark, supra, Justice Harlan stated the proper distinction as follows: "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation." And in the case of United States v. Grimaud, 220 U. S. 520, 31 S. Ct. 480, 484, 55 L. Ed. 563, the rule of law was announced as follows: "The authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof

is punished as a public offense." And again in the same case, it was stated: "In the nature of things it was impracticable for Congress to provide general regulations for these various and varying details of management. Each reservation had its peculiar and special features; and in authorizing the Secretary of Agriculture to meet these local conditions, Congress was merely conferring administrative functions upon an agent, and not delegating to him legislative power."

█ We conclude that while it is the settled law that the legislative power of Congress may not be delegated, the rule is just as firmly established that Congress may declare its will or policy, and devolve upon administrative officers the power and duty of working out the details, and establishing administrative rules. United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 53 S. Ct. 42, 77 L. Ed. 175; Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. The contention of the defendant that the law is unconstitutional because it tends to deprive it of its property without due process of law, and because it is an undue invasion of the defendant's personal rights and liberties, we think is without merit because of the national emergency, which Congress has recognized and declared in the act, and which has so greatly affected the lumber industry, according to the undisputed evidence in this case. Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165; Wilson v. New, 243 U. S. 332, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024; Nebbia v. People of State of New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, decided March 5, 1934; P. F. Petersen Baking Company v. Bryan, 290 U. S. 570, 54 S. Ct. 277, 78 L. Ed. 505, 90 A. L. R. 1285; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; Highland v. Russell Car & Snowplow Co., 279 U. S. 253, 49 S. Ct. 314, 73 L. Ed. 688; Central Lumber Co. v. South Dakota, 226 U. S. 157, 33 S. Ct. 66, 57 L. Ed. 164. The general welfare is involved, the rights of the public, the rights of others engaged in similar business, and under these circumstances the defendant must submit to reasonable regulations and control in the public interest, and the private character of the business of the defendant does not necessarily remove it from such a regulation. Consequently it must comply if the nature of its business brings it under the regulation of

Congress by virtue of the commerce provision.

■ The question remaining—is the defendant engaged in interstate commerce, or does its business directly affect interstate commerce—is somewhat more difficult. It appears from the evidence that the defendant is engaged in the retail lumber business in the city of Omaha; that the trade territory of Omaha extends into the state of Iowa, and perhaps into Kansas, Missouri, and South Dakota; that the defendant purchases its materials in the western timber country. It is shipped in interstate commerce to its yard in Omaha, and is there retailed in small lots to customers solicited to a considerable extent through advertisements inserted in the Omaha World Herald and the Omaha Bee-News, daily newspapers with a circulation extending throughout the trade territory of the city of Omaha. It appears that in one instance a sale was made to a customer residing in the state of Iowa; that in another instance the defendant quoted prices on a bill of lumber with actual notice that the lumber was to be used in the state of Iowa for the construction of a building. A witness testified that due to the quotation of prices through the Omaha papers by the defendant, in his community in the state of Iowa, the lumber trade had fallen off; that small truck loads of lumber were seen coming into the community, some of which were known to have come from the defendant in this case. On the other hand, the officers of the defendant, or some of them, testified that their intent and purpose was to carry on a strictly local cash and carry trade in the yard, and had no purpose or intent to sell in interstate commerce. It does not appear, however, from the testimony on the part of the defendant that they took any precautions to inquire or ascertain whether the lumber sold was to be transported to another state, and no denial was made of the testimony of the witness who stated that the defendant had quoted prices on a bill of lumber after the defendant was advised that it was for use for the construction of a building in the state of Iowa.

Interstate commerce has many ramifications and is not easy to define. In the case of Hopkins v. United States, 171 U. S. 597, 19 S. Ct. 40, 47, 43 L. Ed. 290, Justice Peckham, in discussing the matter, said: "Definitions as to what constitutes interstate commerce are not easily given so that they shall clearly define the full meaning of the term. We know from the cases decided in this court that it is a term of very large significance.

It comprehends, as it is said, intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale, and exchange of commodities between the citizens of different states, and the power to regulate it embraces all the instruments by which such commerce may be conducted. Welton v. State of Missouri, 91 U. S. 275 [23 L. Ed. 347]; County of Mobile v. Kimball, 102 U. S. 691 [26 L. Ed. 238]; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 S. Ct. 826 [29 L. Ed. 158]; Hooper v. California, 155 U. S. 648, 653, 15 S. Ct. 207 [39 L. Ed. 297]; United States v. E. C. Knight Co., 156 U. S. 1, 15 S. Ct. 249 [39 L. Ed. 325]."

It will be conceded that the transaction involving the sale of lumber to the witness Hall was a movement in interstate commerce. Standing alone it perhaps would not be sufficient to establish that the defendant was engaged in interstate commerce, but this fact, together with the submission of the invoice to the witness in Iowa, with knowledge that the shipment was to be made to Iowa, is important as showing the disposition of the defendant to sell to all comers without reference to whence they came. The fact that the delivery was to be made at the yard to the purchaser is unimportant, for as a matter of law the place of delivery does not distinguish the transaction. Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239. Advertising for customers as was done in this case in papers circulating in the border states constitutes interstate commerce under the law. Gibbons v. Ogden, 9 Wheat. 1,189, 6 L. Ed. 23; Blumenstock Bros. Advertising Agency v. Curtis Publishing Co., 252 U. S. 436–442, 40 S. Ct. 385, 64 L. Ed. 649; Konecky v. Jewish Press (C. C. A. 8th Cir.) 288 F. 179, 181; Post Printing, etc., Company v. Brewster, Attorney (D. C.) 246 F. 321.

In the Konecky Case above cited, Judge Kenyon, speaking for our own Circuit Court, stated the law with approval as follows:

"It may be conceded that the circulation of newspapers throughout the country is interstate commerce. Blumenstock v. Curtis, 252 U. S. 436, 40 S. Ct. 385, 64 L. Ed. 649; International Text-Book Co. v. Pigg, 217 U. S. 91, 30 S. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103. In the oft-quoted and great case of Gibbons v. Ogden, 9 Wheat. 1,189, 6 L. Ed. 23, Chief Justice Marshall said: 'Commerce, undoubtedly, is traffic, but it is something more—it is intercourse.' This court has said in Butler Bros. Shoe Co. v. U. S. Rubber Co., 156 F.

17, 84 C. C. A. 183: 'Importation into one state from another is the indispensable element, the test, of interstate commerce, and every negotiation, contract, trade, and dealing between citizens of different states, which contemplates and causes such importation, whether it be of goods, persons, or information, is a transaction of interstate commerce.' "

■ That the defendant was engaged in interstate commerce in its advertising we think is clear, and this brings us now to a consideration of the business operations of the defendant as a whole. It appears from the evidence and is a matter of common knowledge that lumber and lumber products to any consequential extent is not produced in Nebraska. The defendant, like other lumber dealers, engaged in interstate commerce to obtain its stock or supplies for sale. Then in this case, this defendant in turn engaged in interstate commerce for the purpose of obtaining customers. Without employing interstate commerce, its business, like other dealers, could not exist. The whole operation is so closely allied and connected with interstate commerce and so affects interstate commerce generally that, to our mind, brings this business clearly within the regulatory power of Congress. Ramsay Co. v. Associated Bill Posters, 260 U. S. 501, 43 S. Ct. 167, 67 L. Ed. 368; United States v. Ferger, 250 U. S. 199, 39 S. Ct. 445, 63 L. Ed. 936; Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Houston, E. & W. T. R. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Swift & Company v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518; State of Florida v. United States, 54 S. Ct. 603, 78 L. Ed. 1077, decided April 2, 1934; Tagg Brothers & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; Minnesota Rate Case 1913, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

■ A study of the foregoing cases, and many others which we might cite, brings us to the inevitable conclusion that that which affects interstate commerce in a substantial or a direct way, whether it be wholly interstate commerce or partly interstate and partly intrastate, or even an intrastate transaction alone, may be regulated by Congress.

The conclusions which we have reached have support in the more recent decisions in the federal courts. Archie B. Ryan v. Amazon Petroleum Corp. (C. C. A.) 71 F. (2d)

1; United States v. Spotless Cleaners, Inc., 6 F. Supp. 725, U. S. District Court for the Southern District of New York, decided March 31, 1934; Richmond Hosiery Mills v. Camp (D. C.) 7 F. Supp. 139; Harry Victor et al. v. Harold L. Ickes, decided by the Supreme Court of the District of Columbia, December 1, 1933; United States v. Shissler (D. C.) 7 F. Supp. 123.

A permanent injunction will be allowed as prayed for in the complaint.